ORAL ARGUMENT NOT YET SCHEDULED

No. 24-1088

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

WORLD SHIPPING COUNCIL,

*Petitioner,*

*v.*

FEDERAL MARITIME COMMISSION AND UNITED STATES OF AMERICA,

*Respondents.*

On Petition for Review from an Order of the
Federal Maritime Commission

BRIEF OF AMERICAN TRUCKING ASSOCIATIONS, INC.,
AGRICULTURE TRANSPORTATION COALITION, ASSOCIATION
OF BI-STATE MOTOR CARRIERS, CALIFORNIA TRUCKING
ASSOCIATION, HARBOR TRUCKING ASSOCIATION, AND NEW
JERSEY MOTOR TRUCK ASSOCIATION AS AMICI CURIAE IN
SUPPORT OF RESPONDENTS

Richard Pianka
ATA Litigation Center
80 M Street SE
Washington, DC 20003
Phone: (703) 838-1889
rpianka@trucking.org

*Attorney for Amici Curiae*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28, amici curiae, through undersigned counsel, certifies as follows:

**Parties and amici**: Except for American Trucking Associations, Inc., the Agriculture Transportation Coalition, the Association of Bi-State Motor Carriers, the California Trucking Association, the Harbor Trucking Association, and the New Jersey Motor Truck Association, all parties, intervenors, and amici appearing in this Court are listed in the Brief for Petitioner.

**Rulings under review**: Reference to the ruling at issue appears in the Brief for Petitioner.

**Related cases**: This case has not previously been before this Court, and counsel is aware of no related cases pending in this Court or any other court.

/s/ Richard Pianka

## DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, amici curiae make the following disclosures:

- American Trucking Associations, Inc., is a non-profit trade association incorporated in the District of Columbia. It has no parent corporation, and no publicly-held company has a 10% or greater ownership interest in it.

- The Agriculture Transportation Coalition, Inc., is a trade association based in the District of Columbia and incorporated in Delaware. It has no parent corporation, and no publicly-held company has a 10% or greater ownership interest in it.

- The Association of Bi-State Motor Carriers, Inc. is a registered 501(c)(4) non-profit organization. It has no parent corporation, and no publicly-held company has a 10% or greater ownership interest in it.

- The California Trucking Association is a 501(c)(6) non-profit trade association incorporated in California. It has no parent corporation, and no publicly-held company has a 10% or greater ownership interest in it.

- The Harbor Trucking Association is a 501(c)(6) non-profit mutual benefit corporation based in California. It has no parent corporation, and no publicly-held company has a 10% or greater ownership interest in it.

- The New Jersey Motor Truck Association is a 501(c)(6) non-profit trade association. It has no parent corporation, and no publicly-held company has a 10% or greater ownership interest in it.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ......................................................... ii

GLOSSARY ................................................................................. iv

STATUTES AND REGULATIONS ......................................... 1

IDENTITY AND INTEREST OF AMICI CURIAE ............................. 1

ARGUMENT ............................................................................ 4

   A. Congress Did Not Require the FMC to Focus on the Interpretive Rule's Incentive Principle to the Exclusion of ALL Other Considerations ................................................................ 5

   B. The Final Rule Aligns with the Incentive Principle .................... 8

   C. The Final Rule Advances Congress's Broader Goals as Embodied in OSRA ................................................................ 14

CONCLUSION ....................................................................... 22

# TABLE OF AUTHORITIES

**Cases**                                                          **Page(s)**

*Dist. Hosp. Partners, L.P. v. Burwell,*
 786 F.3d 46 (D.C. Cir. 2015)................................................................ 21

*Evergreen Shipping Agency (America) Corp. v. FMC,*
 106 F.4th 1113 (D.C. Cir. 2024) ........................................................ 7

*Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.,*
 463 U.S. 29 (1983)................................................................................ 22

*Nat'l Union Fire Ins. Co. v. Riggs Nat. Bank,*
 5 F.3d 554 (D.C. Cir. 1993).................................................................. 13

*New York v. U.S. E.P.A.,*
 413 F.3d 3 (D.C. Cir. 2005).................................................................. 21

*TCW, Inc. v. Evergreen Shipping Agency (Am.) Corp.,* No. 1966(I),
 2022 WL 18068977 (F.M.C. Dec. 29, 2022) .......................................... 7

*TCW, Inc. v. Evergreen Shipping Agency (Am.) Corp.,* No. 1966(I),
 2021 WL 794708 (F.M.C. Feb. 19, 2021) ............................................ 12

**Statutes**

46 U.S.C. § 40101(2) ................................................................................ 16

Ocean Shipping Reform Act,
 Pub. L. 117-146, 136 Stat. 1272 (2022)................................ 4, 6, 15, 17

**Rules & Regulations**

46 C.F.R. § 545.5(c)................................................................................... 7

46 C.F.R. § 545.5(d) .................................................................................. 7

## TABLE OF AUTHORITIES
### (continued)

Pages(s)

46 C.F.R. § 545.5(f) ............................................................. 8

Demurrage and Detention Billing Requirements,
  87 Fed. Reg. 62,341 (Oct. 14, 2022) .................................. 9, 10

Denial of Pet. for Delay of Effective Date of the Demurrage and Deten-
  tion Billing Requirements Final Rule,
  89 Fed. Reg. 77,787, (Sept. 24, 2024) ................................. 19

Final Rule on Demurrage and Detention Billing Requirements,
  89 Fed. Reg. 14,330 (Feb. 26, 2024) ...................... 4, 10, 15, 17, 18, 21

Interpretive Rule on Demurrage and Detention Under the Shipping Act,
  85 Fed. Reg. 29,638 (May 18, 2020) ..................... 5, 8, 11, 13, 15, 18

# GLOSSARY

| | |
|---|---|
| ATA | American Trucking Associations, Inc. |
| AgTC | Agriculture Transportation Coalition |
| Bi-State | Association of Bi-State Motor Carriers |
| CIR | Certified Index to the Record |
| CTA | California Trucking Association |
| FMC | Federal Maritime Commission |
| HTA | Harbor Trucking Association |
| IMCC | Intermodal Motor Carriers Conference |
| NJMTA | New Jersey Motor Truck Association |
| OSRA | Ocean Shipping Reform Act of 2022 |
| WSC | World Shipping Council |

## STATUTES AND REGULATIONS

All applicable statutes and regulations are contained in the Addendum to the Opening Brief for Petitioner.

## IDENTITY AND INTEREST OF AMICI CURIAE[*]

American Trucking Associations, Inc. (ATA), is the national association of the trucking industry. Its direct membership includes approximately 1,800 trucking companies and in conjunction with 50 affiliated state trucking organizations, it represents over 30,000 motor carriers of every size, type, and class of motor carrier operation. The motor carriers represented by ATA haul a significant portion of the freight transported by truck in the United States and virtually all of them operate in interstate commerce among the states. ATA regularly represents the common interests of the trucking industry in courts throughout the nation, including this Court. The ATA's Intermodal Motor Carriers Conference (IMCC) comprises companies engaged in the intermodal transportation of property, and represents that sector of the trucking industry on pub-

---

[*] All parties have consented to the filing of this amicus brief. *See* Fed. R. App. P. 29(a)(2). No counsel for either party authored this brief in whole or in part, and no party, party's counsel, or person other than the amici, their members, or their counsel contributed money that was intended to fund preparing or submitting this brief. *See* Fed. R. App. P. 29(a)(4)(E).

lic policy issues.

The Agriculture Transportation Coalition (AgTC) is a trade associa-
tion founded in 1987 with the objective of representing exporters and
importers of agricultural commodities, and assuring transportation ser-
vice that allows exporters of agricultural products in the U.S. to be
competitive in the international market. AgTC members harvest, raise,
produce, and process every agricultural commodity, in every state in the
nation. AgTC's core mission is to pursue an efficient, dependable, and
cost-effective transportation supply chain. Because the agriculture and
forest products produced in the U.S. can also be sourced elsewhere, effi-
cient ocean shipping is particularly critical to AgTC's members and the
U.S. agriculture industry in general, to ensure that they can deliver
their products affordably and reliably to customers abroad.

The Association of Bi-State Motor Carriers, Inc. is a non-profit organ-
ization representing the intermodal trucking industry. With close to 200
member companies located throughout the United States and Canada,
the Bi-State's motor carrier members are responsible for moving a ma-
jority share of port and container traffic at the Port of New York and
New Jersey.

2

The California Trucking Association (CTA) is a trade association representing the interests of motor carriers in California, and is ATA's federation partner in the state. CTA's members transport approximately 85 percent of the shipments that travel on California's highways each day, and extensively serve California's ports, which include the two largest U.S. ports in terms of container volume, and which collectively constitute a critical component of the U.S. and global supply chains.

The Harbor Trucking Association (HTA) is a non-profit organization based in California, representing motor carriers who transport marine containers to and from maritime ports on the west coast of the United States. HTA is the largest non-profit trade association exclusively representing harbor drayage carriers in the nation.

The New Jersey Motor Truck Association (NJMTA) was founded in 1914 to protect and promote the interests of the New Jersey trucking industry, and is committed to fostering sound economical and efficient service by motor carrier transportation. NJMTA has over 300 members, a substantial number of which are involved in intermodal transportation, as New Jersey is home to the largest container port on the east coast of the United States.

Amici each have a strong interest in the rule at issue in this case, because their memberships include either motor carriers who move shipping containers in and out of the nation's maritime ports, or shippers who move commodities through those ports. Thus, each of the amici represent members who have a direct interest in ensuring that billing practices for demurrage and detention are just and reasonable; and each of the amici participated in the underlying rulemaking through comment submissions on the proposed rule. Moreover, as industry groups with practical knowledge of how detention and demurrage charges affect both shippers and motor carriers, amici's perspective will assist the Court in understanding the practical impacts of the rule under review on key components of the supply chain.

## ARGUMENT

WSC's arguments that the Final Rule on Demurrage and Detention Billing Requirements (Final Rule), 89 Fed. Reg. 14,330 (Feb. 26, 2024), is contrary to statute and arbitrary and capricious all rest on their contention that the Ocean Shipping Reform Act (OSRA), Pub. L. 117-146, 136 Stat. 1272 (2022), required the FMC to develop a rule focused exclusively on the "incentive principle" articulated in the FMC's earlier

Interpretive Rule on Demurrage and Detention Under the Shipping Act (Interpretive Rule), 85 Fed. Reg. 29,638 (May 18, 2020), and that the Final Rule fails to serve that principle. Both of those contentions are incorrect. As the FMC explains in its brief, WSC is wrong in its assertion that the Final Rule is fatally misaligned with the incentive principle, Resp. Br. at 33–36, and they are wrong to suggest that OSRA compelled the FMC to exclude all other considerations, *id.* at 27–28. Amici submit this brief to further explain why the Final Rule adheres closely to the incentive principle as articulated in the Interpretive Rule, while simultaneously furthering the *additional* principles articulated in the Interpretive Rule and mandated by Congress in OSRA, more effectively than WSC's alternative would.

### A. Congress Did Not Require the FMC to Focus on the Interpretive Rule's Incentive Principle to the Exclusion of All Other Considerations.

1. WSC repeatedly insists that "the FMC was required to follow Congress's instruction that its Final Rule *only* clarify 'reasonable rules and practices' *under the [i]ncentive [p]rinciple* when determining which parties are appropriately billed." Pet. Br. at 22 (emphases added). *See also, e.g., id.* at 27 (OSRA "expressly adopted and incorporated the

5

[i]ncentive [p]rinciple"); 29–30 ("Congress elevated the [i]ncentive [p]rinciple from mere interpretive rule to a statutory requirement"); 33 ("Congress did not give the FMC the authority to revisit, let alone undermine, the [i]ncentive [p]rinciple"). But the implication that Congress was single-mindedly fixated on the incentive principle when it instructed the FMC to make "a determination of which parties may be appropriately billed" for demurrage and detention, OSRA § 7(b)(2), is simply false. Nowhere in the text of the statute does Congress use the term "incentive principle," much less expressly commit the FMC to uniquely adhere to it.

To be sure, OSRA does limit the FMC to a rule that "shall only seek to further clarify reasonable rules and practices related to the assessment of detention and demurrage charges *to address the issues identified* in the" Interpretive Rule. OSRA § 7(b)(2) (emphasis added). That is, the plain language of the statute limits the scope of *issues* Congress was directing the FMC to address via rulemaking—and it expressly included "a determination of which parties may be appropriately billed" as one of those issues. *Id.* Nothing in the statutory text, however, imposes an obligation on the FMC to satisfy any particular principles—much less the

6

incentive principle—in "clarify[ing] reasonable rules and practices" to address those issues. *Id.*

2. But even if WSC were correct that OSRA required the FMC to is-sue a rule rooted exclusively in the principles articulated in the Inter-pretive Rule, that would not require the FMC to align the rule perfectly to the incentive principle to the exclusion of all other considerations, for the simple reason that the Interpretive Rule itself encompassed a range of considerations. Indeed, as this Court recently observed in applying the Interpretive Rule in a different case, "'terms such as "incentive principle" do not replace "reasonableness" which is the underpinning of the Shipping Act.'" *Evergreen Shipping Agency (America) Corp. v. FMC*, 106 F.4th 1113, 1117 (D.C. Cir. 2024) (quoting *TCW, Inc. v. Evergreen Shipping Agency (Am.) Corp.*, No. 1966(I), 2022 WL 18068977 at *10 (F.M.C. Dec. 29, 2022) (Bentzel, Comm'r, dissenting)).

In addition to the incentive principle, 46 C.F.R. § 545.5(c), the Inter-pretive Rule announced that the FMC could "consider in the reasona-bleness analysis the existence, accessibility, content, and clarity of policies implementing demurrage and detention practices and regula-tions, including dispute resolution policies and practices." *Id.* § 545.5(d).

7

And it expressly noted that nothing in the Interpretive Rule was intended to preclude "considering factors … in addition to those specifically listed" in the Rule. *Id.* § 545.5(f). The FMC was careful to explain that its Interpretive Rule "was a non-exclusive list of factors" for "assessing the reasonableness of demurrage and detention practices." 85 Fed. Reg. at 29,639.

The FMC also explained that while one goal was to "promote fluidity in the U.S. freight delivery system" through alignment with the incentive principle, the Interpretive Rule was also intended to "mitigate confusion, reduce and streamline disputes, and enhance competition and innovation in business operations and policies." 85 Fed. Reg. at 29,639. Those latter goals were critical, because the FMC's "review of ocean carrier and marine terminal operator records … showed that the practices were rife with complexity, inconsistency, lack of transparency, and variability." *Id.* at 29,643. As we explain further below, the Final Rule's determination of which parties can be billed was carefully designed to address these issues, as well as to align with the incentive principle.

### B. The Final Rule Aligns with the Incentive Principle.

As the FMC explained, and as the evidence in the administrative

8

record substantiates, the Final Rule is well-aligned with the incentive principle—in fact, it serves the incentive principle far *better* than the alternative sought by WSC would. In the mine run of cases, billing motor carriers for demurrage or detention *cannot* serve to incentivize freight velocity, either because the motor carrier is not privy to demurrage and detention terms that the ocean carrier and shipper agreed to (including the amount of "free time" provided in that agreement); because the bottlenecks responsible for delays are outside the motor carrier's control; or both.

1. As the FMC stressed, and as the record reflects, motor carriers generally are not parties to the agreements between ocean carriers and shippers, and it is *those* agreements that specify the controlling terms for how much "free time" the shipper negotiated for before demurrage or detention charges begin to accrue. Even in the case of a "carrier haulage" move—where the ocean carrier enters into an arrangement with a motor carrier to complete the inland portion of the move—the motor carrier typically has no (or incomplete) information about the demurrage and detention terms in the shipping contract under which the container is moving. *See, e.g.*, Demurrage and Detention Billing

9

Requirements, 87 Fed. Reg. 62,341, 62,349–50 (Oct. 14, 2022); 89 Fed. Reg. at 14,338–40, 14,356–57; *see also, e.g.*, CIR Doc. 199 (IMC Companies, LLC, comment to NPRM) at 1 (shippers and ocean carriers "agree to detention and demurrage terms that a motor carrier is neither privy to the terms of nor able to manage due to lack of information") (cleaned up); CIR Doc. 214 (Reliable Transportation Specialists, Inc. comment to NPRM) (noting that ocean carriers regularly bill motor carriers for demurrage and detention based on boilerplate terms in their addendum to the Uniform Intermodal Interchange Agreement, despite "[k]nowing those are NOT the terms for [the] shipment" as negotiated in the controlling agreement between ocean carrier and shipper).

Under those circumstances, billing the motor carrier for demurrage and detention *cannot* serve the incentive principle, because there is no way to incentivize a motor carrier to, in effect, meet deadlines it is not privy to until after the fact. In terms of alignment with the incentive principle, billing the shipper—who knows the "free time" terms and is thus in a position to do something about them—is far more reasonable.

2. WSC relies extensively on a purely hypothetical scenario of its own creation to suggest that motor carriers can be responsible for the delays

10

that lead to demurrage and detention charges, and thus that the incentive principle requires ocean carriers to be able to bill motor carriers for those charges. Pet. Br. at 15–16, 40. Against that hypothetical, though, is the FMC's well-supported conclusion that there are any number of real-world situations in which "a motor carrier's delay is the result of no action of their own," 85 Fed. Reg. at 14,339. Thus, to whatever extent the WSC is correct that the Final Rule is not *perfectly* aligned with the incentive principle, that would be true as well of a rule that allowed ocean carriers to bill motor carriers for demurrage and detention.

In fact, such a rule would be far more poorly aligned. Motor carriers have an inherent commercial incentive that is aligned with freight fluidity: in the context of port drayage, they are paid to pick up and return containers, not to tarry; and they are paid by the container movement, not by the day or hour. With or without the threat of demurrage and detention bills, a motor carrier has a strong financial incentive to complete their movements as quickly and efficiently as possible. No surprise then, that when a motor carrier picks up a container after free time has expired, the most likely explanation is a circumstance beyond the motor carrier's control: delayed notice of container availability; lack of port

appointments; gate processing issues; closed terminal areas; extreme congestion; or customs issues. And similarly, when a motor carrier is delayed in returning an empty container, similar issues—or the shipper or consignee's delay in unloading the container—are the likely causes. *See, e.g.*, *TCW, Inc. v. Evergreen Shipping Agency (Am.) Corp.*, No. 1966(I), 2021 WL 794708, at *9–*10 (F.M.C. Feb. 19, 2021) (shipper did not make empty container available for motor carrier to pick up and return until four days after container free time had expired). These factors are just as likely to be the cause of delay in a "carrier haulage" move (where the ocean carrier has an arrangement with the motor carrier to provide inland transportation) as it is in "merchant haulage" moves (where there is no direct arrangement between ocean carrier and motor carrier). *See, e.g.*, CIR Doc. 257 (Ocean Carrier Equipment Management Association comment to NPRM) at 5 ("as the Commission is well aware, the consignee may control pick-up and delivery even on so-called carrier haulage moves"). And in such cases, billing the motor carrier for demurrage or detention would not serve the incentive principle at all, because there is nothing they can do about these factors. Against that background, the FMC reasonably chose a rule that was most likely

to align the incentive of a demurrage and detention bill with the party best equipped to mitigate delays through the adoption of efficient operational procedures. *See, e.g., Nat'l Union Fire Ins. Co. v. Riggs Nat. Bank*, 5 F.3d 554, 557 (D.C. Cir. 1993) (Silberman, J., concurring) (assigning liability to the party "best positioned to avoid the loss … increases the incentive for that party to adopt preventive measures and ensures that such measures would have the greatest marginal effect on preventing the loss").

3. Finally, even if a motor carrier were fully informed of the demurrage and detention terms of the shipping agreement, the associated charges still would not ultimately be the responsibility of the motor carrier—they are, rather, "contractually-owed by cargo interests" who negotiated the shipping agreement with the ocean carrier. 85 Fed. Reg. at 29,661. Any incentive effect that a demurrage and detention bill might in theory otherwise have on a motor carrier would thus be heavily attenuated by the fact that they will generally pass the charges on to the shipper.

Moreover, if ocean carriers were permitted to bill motor carriers for demurrage and detention, there is no reason to expect they would do so

in a way that aligned with the incentive principle, by, say, only doing so in cases that closely track WSC's hypothetical example of a motor carrier with full knowledge of demurrage and detention terms, and with full control over delays. As we explain below, it would be in the ocean carrier's interest to bill motor carriers without regard to the motor carrier's actual responsibility—which, in any event, they will as a practical matter rarely be in a position to ascertain ex ante. Thus, motor carriers would routinely receive bills for delays that they had no control over (and often no knowledge of), while shippers—who are best positioned to respond to incentives to unload containers and promptly make them ready for return—would not. The regime that WSC claims is required by OSRA would in fact be profoundly misaligned with the incentive principle.

## C. The Final Rule Advances Congress's Broader Goals as Embodied in OSRA.

The choices made by the FMC in the Final Rule were also well-designed to address the additional issues identified in the Interpretive Rule, which Congress in OSRA obligated the FMC to address.

1. The Final Rule's determination of appropriate billing parties indisputably advances the Interpretive Rule's (and thus OSRA's) interest

14

in the "clarity of policies implementing demurrage and detention practices." 85 Fed. Reg. at 29,666. The bright-line rule adopted by the FMC is clear in limiting bills to the parties best able to evaluate them against the governing terms of the shipping contract, and who are ultimately responsible for their payment. 89 Fed. Reg. at 14,338, 14,356–57. By contrast, a rule that allowed ocean carriers to bill motor carriers—or at least to do so when the motor carrier was in some kind of contractual relationship with the ocean carrier and was (in the ocean carrier's view) responsible for the delay—would leave the parties with no way of knowing in advance where the bill would end up. A rule that "the ocean carrier decides" would thus provide no clarity at all, and would be inconsistent with Congress's command that the FMC make "a determination of which parties may be appropriately billed." OSRA § 7(b)(2).

The Final Rule does more to address the Interpretive Rule's issue than provide clarity for clarity's sake. The FMC's bright-line rule is tailored to ameliorate massive inefficiencies in billing practices and especially dispute resolution that regularly resulted from the ocean carriers' practice of indiscriminately saddling motor carriers with the bills. Under that regime, motor carriers needed to expend significant resources

to determine whether the charges were appropriate under the terms of the agreement between the ocean carrier and the shipper, and act as the middleman in disputes about the shipper's obligation to the ocean carrier; they were effectively responsible for resolving any discrepancy that might exist between the demurrage and detention bill and the demurrage and detention terms in the shipping contract, despite not being a party to (or even privy to) the latter. *See, e.g.*, CIR Doc. 124 (TCW, Inc., comment to NPRM) at 1–2. Such a system is manifestly less efficient than the one created by the Final Rule, under which the parties to the shipping contract are left to work out their obligations under that contract, without the unnecessary involvement of third-party motor carriers. This allows motor carriers to focus their resources on the efficient movement of containers to and from the ports, which in turn better serves the needs of the supply chain, and furthers the Shipping Act's overarching goal of "ensur[ing] an efficient, competitive, and economical transportation system in the ocean commerce of the United States." 46 U.S.C. § 40101(2).

2. Equally clear is that a rule under which an ocean carrier was free to bill motor carriers for demurrage and detention (at least in a carrier-

haulage context) would be radically misaligned with all of these consid-
erations. For one thing, a rule that allowed ocean carriers to continue
billing motor carriers at their discretion would be difficult to materially
distinguish from the status quo before the Final Rule, which would be
impossible to square with OSRA's command that the FMC issue a rule
"further defining prohibited practices" beyond the Interpretive Rule it-
self. OSRA § 7(b)(1).

Additionally, billing motor carriers for these charges—rather than
the customers who actually contracted to pay them—effectively turns
the motor carrier into the ocean carrier's unwilling collection agent. And
as the FMC further recognized, prior to the Final Rule's adoption "mo-
tor carriers frequently f[ound] themselves locked out from marine ter-
minals for failure to pay detention charges as the motor carriers
wait[ed] to receive payment from their customers." 89 Fed. Reg. at
14,338. This meant that motor carriers were regularly "trapped in situ-
ations where they ha[d] no contractual leverage or negotiation power to
fight back," *id.*, and faced the choice of covering the shipper's obligations
in the hope of ultimately recovering them, or being blocked from carry-
ing any of the ocean carrier's containers. Such a system is understanda-

bly appealing to the ocean carriers: it allows them to use their leverage to extract payments for the shipper's demurrage and detention obligations from a third-party motor carrier under threat of "'shutting out' truckers" with outstanding invoices, 85 Fed. Reg. at 29,661, without having to endure the commercial friction of seeking those payments from customers whose business they want to maintain. That model provides no incentive for the ocean carriers to improve the accuracy of their demurrage and detention bills, or to mitigate the costs associated with their own delays. Such a system might occasionally happen to align with the incentive principle, as in WSC's hypothetical example, but far from advancing the underlying goals of the Interpretive Rule and OSRA, those practices would "impede efficient cargo movement" and "raise[] potentially serious concerns under other sections of the Shipping Act." *Id.* The Final Rule addresses those issues, to the benefit of freight fluidity and the supply chain as a whole.

3. In this regard, it is notable that the shipper community was largely supportive of the Final Rule, even though it means that they will be *more* likely to receive bills for demurrage and detention than they were previously. *See* 89 Fed. Reg. at 14,338. Indeed, when the Ocean Carrier

Equipment Management Association petitioned the FMC to delay the effective date of the Final Rule, shipper groups weighed in aggressively in opposition. *See* Denial of Pet. for Delay of Effective Date of the Demurrage and Detention Billing Requirements Final Rule, 89 Fed. Reg. 77,787, 77,789 and n.16 (Sept. 24, 2024). One coalition of shippers objected that the Final Rule "provides public benefits that would be thwarted if the rule were halted," including "shippers … not receiving confusing or even duplicative bills for demurrage and detention" and "better communication between shippers and carriers and a reduction in actual incidents of detention and demurrage," "improved freight transportation efficiency," and "enhanced supply chain efficiency." FMC-2024-0010-0013 (comments of the Shippers Coalition), *available at* https://www.regulations.gov/comment/FMC-2024-0010-0013.    Another noted that the Final Rule "address[ed] long-standing issues we have all witnessed with [d]etention and [d]emuirrage billing practices," and would "bring clarity to the issue as well as improve fluidity at our nation's ports and terminals. FMC-2024-0010-0014 (comments of 63 trade associations representing shippers, beneficial cargo owners, trucking companies, and other supply chain stakeholders), *available at* https://

19

www.regulations.gov/comment/FMC-2024-0010-0014.

These shipper groups undeniably have an acute interest in freight fluidity and supply chain efficiency. And given the nature of their business they can be expected to understand, through direct experience, the dysfunctions of the demurrage and detention billing practices that prevailed before the Final Rule. Given that shippers are, as it were, at the "sharp end" of the Final Rule insofar as it means the bills are exclusively their problem to deal with, their enthusiastic support for the Final Rule speaks volumes about its alignment with OSRA's and the Interpretive Rule's overall goals of improving supply chain performance.

\* \* \*

The bottom line is that, at best, WSC has shown that when applied to a particular hypothetical scenario, the Final Rule might not be maximally aligned with the incentive principle. But the kind of rule that WSC contends is required by OSRA would also fall short of perfect alignment with that principle—more so than the Final Rule itself—and would also conflict with the other policy goals embodied in the Interpre-

20

tive Rule and OSRA. That the Final Rule might be imperfect does not render it arbitrary or capricious, nor contrary to statute. "[I]mperfection alone does not amount to arbitrary decision-making," *Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 61 (D.C. Cir. 2015), and the possibility that "evidence in the record may also support other conclusions" does not render the FMC's choice arbitrary and capricious, *New York v. U.S. E.P.A.*, 413 F.3d 3, 31 (D.C. Cir. 2005) (internal quotation marks omitted). To the extent that FMC was faced with two options, neither of which perfectly serves the incentive principle, it was well within its discretion to choose the option that, in its well-reasoned judgment, better addresses the full range of issues Congress commanded it to address. *See* 89 Fed. Reg. at 14,339 (recognizing the possibility that "other parties may in some circumstances have more influence on whether demurrage or detention actually accrues," but nevertheless "are not the best party to understand the terms of the contract and dispute any charges").

That the Final Rule might not serve all of those objectives flawlessly in every conceivable situation is no basis to vacate it. In such circumstances, "the agency must ... exercise its judgment in moving from the

facts and probabilities on the record to a policy conclusion." *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 52 (1983). The agency must, of course, "offer a rational connection between the facts found and the choice made" in such cases. *Id.* (internal quotation marks omitted). The FMC's extensive explanation of its choices in the Final Rule more than satisfies that standard.

## CONCLUSION

For the foregoing reasons, and those stated in the brief of Respondent FMC, the Petition for Review should be denied.

Dated:   December 9, 2024        Respectfully submitted,

/s/ Richard Pianka

Richard Pianka
ATA Litigation Center
80 M Street SE
Washington, DC 20003
rpianka@trucking.org
(703) 838-1889

*Attorney for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), I hereby certify that this brief complies with the type-volume limitation of Rule 32(a)(7) because it contains 4,302 words, excluding the parts of the brief exempted by Rule 32(f) and Circuit Rule 32(e)(1); and complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared using Microsoft Word (Office 365) and is set in 14-point Century font.

Date: December 9, 2024                    /s/ Richard Pianka

## CERTIFICATE OF SERVICE

I hereby certify that on December 9, 2024, I electronically filed the foregoing brief with the Clerk of the Court using the Court's CM/ECF system, and that counsel for all participants in this case will be served by the CM/ECF system.

Date: December 9, 2024                    /s/ Richard Pianka