**ORAL ARGUMENT NOT YET SCHEDULED**

**No. 24-1088**

_____

*In the*

# United States Court of Appeals

*for the*

## District of Columbia Circuit

_____

WORLD SHIPPING COUNCIL,
*Petitioner*,

– v. –

FEDERAL MARITIME COMMISSION AND UNITED STATES OF AMERICA,
*Respondents*.

_____

On Petition for Review from an Order
of the Federal Maritime Commission
No. FMC-1: FMC-89FR14330

_____

**REPLY BRIEF FOR PETITIONER**

_____

PAUL W. HUGHES
ANDREW A. LYONS-BERG
GRACE WALLACK
  *McDermott Will & Emery LLP*
  *500 North Capitol Street NW*
  *Washington, DC 20001*
  *(202) 756-8000*

  *Counsel for Petitioner*
  *World Shipping Council*

# TABLE OF CONTENTS

Table of Authorities..........................................................................ii

Introduction .....................................................................................1

Argument .........................................................................................2

I.  WSC plainly has standing. ...........................................................2

II.  The Final Rule is contrary to statute. .........................................7

    A.  The Final Rule is incompatible with OSRA. ...................................7

    B.  The Final Rule exceeds the Commission's authority under
        46 U.S.C. § 41102(c)........................................................13

III.  The FMC's Final Rule is arbitrary and capricious. ............................16

    A.  The Final Rule is substantively arbitrary and capricious. ..........16

    B.  The Final Rule is procedurally arbitrary and capricious..............19

IV.  WSC has standing to challenge the FMC's flawed NEPA order. .......24

V.  The Court should order completion of the administrative record. .....27

Conclusion........................................................................................29

# TABLE OF AUTHORITIES[†]

**Page(s)**

**Cases**

*Am. Fuel & Petrochemical Manufacturers v. EPA*,
   3 F.4th 373 (D.C. Cir. 2021) ...................................................................6

\* *Am. Library Ass'n v. FCC*,
   401 F.3d 489 (D.C. Cir. 2005) ...............................................................7

*ANR Storage Co. v. FERC*,
   904 F.3d 1020 (D.C. Cir. 2018) ...........................................................21

*Ass'n of Am. Railroads v. Dep't of Transp.*,
   38 F.3d 582 (D.C. Cir. 1994) .................................................................4

*Atl. City Elec. Co. v. FERC*,
   295 F.3d 1 (D.C. Cir. 2002) .................................................................15

*Bloomberg L.P. v. SEC*,
   45 F.4th 462 (D.C. Cir. 2022) ..............................................................23

*Carlson v. Postal Regul. Comm'n*,
   938 F.3d 337 (D.C. Cir. 2019) ..............................................................22

*Carpenters Indus. Council v. Zinke*,
   854 F.3d 1 (D.C. Cir. 2017) ...................................................................4

*City of Vernon v. FERC*,
   845 F.2d 1042 (D.C. Cir. 1988) ............................................................22

*Competitive Enter. Inst. v. NHTSA*,
   901 F.2d 107 (D.C. Cir. 1990) ..............................................................26

*Consumer Fed'n of Am. & Pub. Citizen v. U.S. Dep't of Health
   & Hum. Servs.*,
   83 F.3d 1497 (D.C. Cir. 1996) ..............................................................27

*Ctr. for Biological Diversity v. EPA*,
   861 F.3d 174 (D.C. Cir. 2017) ..............................................................25

---

[†] Authorities marked with an asterisk are those on which we chiefly rely.

## Cases—continued

*FDA v. Brown & Williamson Tobacco Corp.*,
  529 U.S. 120 (2000) ...................................................................10

*Fla. Audubon Soc. v. Bentsen*,
  94 F.3d 658 (D.C. Cir. 1996) ....................................................25

*Genuine Parts Co. v. EPA*,
  890 F.3d 304 (D.C. Cir. 2018) ..................................................17

*Gunpowder Riverkeeper v. FERC*,
  807 F.3d 267 (D.C. Cir. 2015) ..................................................26

*Hydro Res., Inc. v. EPA*,
  608 F.3d 1131 (10th Cir. 2010) ...................................................5

* *Loper Bright Enterprises. v. Raimondo*,
  603 U.S. 369 (2024) ........................................................8, 9, 12

*Lujan v. Defs. of Wildlife*,
  504 U.S. 333 (1992) .....................................................................3

* *Me. Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*,
  70 F.4th 582 (D.C. Cir. 2023)......................................................2

*Michigan v. EPA*,
  576 U.S. 743 (2015) .....................................................................9

*Montana-Dakota Utilities Co. v. Nw. Pub. Serv. Co.*,
  341 U.S. 246 (1951) ...................................................................15

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto.*
  *Ins. Co.*,
  463 U.S. 29 (1983) .....................................................................20

*Mozilla Corp. v. FCC*,
  940 F.3d 1 (D.C. Cir. 2019) ......................................................12

*Nat'l Trucking & Storage Co. v. Pennsylvania R. Co.*,
  228 F.2d 23 (D.C. Cir. 1955) ....................................................17

*NGL Transportation LLC v. W. Basin Container*,
  2016 WL 11817426 (C.D. Cal. Sept. 14, 2016).......................17

*Oceana, Inc. v. Ross*,
  290 F. Supp. 3d 73 (D.D.C. 2018) ............................................28

**Cases—continued**

*Oglala Sioux Tribe v. U.S. Nuclear Regul. Comm'n*,
  896 F.3d 520 (D.C. Cir. 2018) ....................................................24

\* *Open Soc'y Inst. v. USCIS*,
  573 F. Supp. 3d 294 (D.D.C. 2021) .....................................28, 29

*Safe Skies Clean Water Wisconsin, Inc. v. United States Air
  Force*,
  2022 WL 22626434 (D.D.C. Sept. 30, 2022)............................27

\* *Sierra Club v. EPA*,
  292 F.3d 895 (D.C. Cir. 2002) .....................................................2

*Sierra Club v. U.S. Dep't of Energy*,
  107 F.4th 1012 (D.C. Cir. 2024)...................................................6

*Sinclair Wyoming Ref. Co. v. EPA*,
  114 F.4th 693 (D.C. Cir. 2024).....................................................23

*Skidmore v. Swift & Co.*,
  323 U.S. 134 (1944) .......................................................................9

\* *State Nat'l Bank of Big Spring v. Lew*,
  795 F.3d 48 (D.C. Cir. 2015) ........................................................3

*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009) .......................................................................5

*TransCanada Power Mktg. Ltd. v. FERC*,
  811 F.3d 1 (D.C. Cir. 2015) ........................................................22

*Twin Rivers Paper Co. v. SEC*,
  934 F.3d 607 (D.C. Cir. 2019) ......................................................6

\* *Util. Air Regul. Grp. v. EPA*,
  573 U.S. 302 (2014) .....................................................................11

*Vanda Pharms., Inc. v. Food & Drug Admin.*,
  2023 WL 2645714 (D.D.C. Mar. 27, 2023) ................................29

*Whitman v. Am. Trucking Associations*,
  531 U.S. 457 (2001) .....................................................................10

\* *WildEarth Guardians v. Jewell*,
  738 F.3d 298 (D.C. Cir. 2013) ...............................................24, 25

## Cases—continued

*WildEarth Guardians v. Zinke,*
  368 F. Supp. 3d 41 (D.D.C. 2019) ............................................26

*Window Covering Mfrs. Ass'n v. Cons. Prod. Safety Comm'n,*
  82 F.4th 1273 (D.C. Cir. 2023) ..............................................6

\* *Wynnewood Refining Co. v. EPA,*
  77 F.4th 767 (D.C. Cir. 2023)...........................................2, 6

*Wyo. Outdoor Council v. U.S. Forest Serv.,*
  165 F.3d 43 (D.C. Cir. 1999) ...............................................22

## Statutes, Rules, and Regulations

46 U.S.C.
  § 41102(c) ................................................................13, 14, 16
  § 41104(a)(15)...............................................................19
  § 41104(a)(15)(B) ......................................................10, 12

46 C.F.R.
  § 541.3 ...................................................................3, 22
  § 541.4 ...................................................................3, 22
  § 545.5 .....................................................................12
  § 545.5(c) ..................................................................16

85 Fed. Reg. 29,638 (May 18, 2020) ...........................................12

87 Fed. Reg. 8,506, 8,506 (Feb. 15, 2022) ....................................14

87 Fed. Reg. 62,341 (Oct. 14, 2022)............................................3

89 Fed. Reg. 14,330 (Feb. 26, 2024) ...........................3, 4, 14, 18, 19, 20, 21

89 Fed. Reg. 39,569 (May 9, 2024) .............................................28

Ocean Shipping Reform Act, Pub. L. 117-146, 136 Stat. 1272
  (2022)...............................................................8, 10, 12, 13

## Other Authorities

FMC, *World Shipping Council Agreement* (Agreement No.
  201349) (last accessed Jan. 6, 2025).......................................5, 6

**INTRODUCTION**

As explained in our opening brief, the FMC's rulemaking is unlawful multiple times over: It exceeds the Commission's statutory authority, including by contravening the Incentive Principle that Congress codified in the Ocean Shipping Reform Act (OSRA); it is substantively arbitrary and capricious for similar reasons; and it suffers from a host of deficiencies of explanation in violation of the APA and NEPA.

The Commission's responses fail to persuade—and are revealing of one of the Final Rule's key flaws: The Commission's stated purpose does not match the policy that the Commission ultimately chose to adopt. The FMC repeatedly emphasizes that it intended to limit demurrage and detention invoices to only the parties that negotiated the relevant contracts, as these parties "would likely have greater knowledge" and would be better able to evaluate and dispute any charges. FMC Br. 31-32. But the Final Rule prohibits billing motor carriers, *even* when those motor carriers have contractual relationships with the ocean common carrier and are thus the best-positioned party to receive the invoice under the FMC's own reasoning. This fundamental mismatch between reasoning and result renders the Commission's action both outside of its statutory authority and arbitrary and capricious. The Final Rule should be vacated.

1

# ARGUMENT

## I.   WSC PLAINLY HAS STANDING.

Tellingly, the FMC begins its brief by raising the meritless contention that WSC—the trade association whose members make up 90% of the directly regulated industry—somehow lacks standing to challenge the rule. FMC Br. 20-22. That contention is, putting it mildly, not credible.

**A.** First, it is simply not true that an association "must demonstrate representational standing by providing affidavits from identified members." FMC Br. 21. Extra-record evidence is required *only* "when the petitioner's standing is not self-evident" (*Sierra Club v. EPA*, 292 F.3d 895, 900 (D.C. Cir. 2002)), a situation which is the exception, not the rule. *See id.* ("In many if not most cases the petitioner's standing to seek review of administrative action *is* self-evident," particularly where "the complainant is an object of the action (or foregone action) at issue.") (emphasis added).

As we described (Opening Br. 25-26), WSC's members are the object of the regulation here, making both their injury and WSC's associational standing "self-evident"; as a result, "no evidence outside the administrative record is necessary." *Sierra Club*, 292 F.3d at 900; *see also, e.g.*, *Wynnewood Refining Co. v. EPA*, 77 F.4th 767, 777 (D.C. Cir. 2023) (same); *Me. Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*, 70 F.4th 582, 592 (D.C. Cir. 2023) ("The lobstermen's standing to challenge the phase one rule is self-

evident, as they are the 'object of the action.'") (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 333, 343 (1992)); *State Nat'l Bank of Big Spring v. Lew*, 795 F.3d 48, 53 (D.C. Cir. 2015) (similar).

There can be no question that the rule directly regulates WSC's members, who are all "ocean common carrier[s]" to whom the rule's billing prohibitions and other requirements apply. 89 Fed. Reg. 14,330, 14,362 (Feb. 26, 2024); *see* 46 C.F.R. §§ 541.3, 541.4. To the extent the FMC is suggesting that directly regulated parties must do more to demonstrate their standing to challenge the very rules that regulate them, that position is remarkable. *See, e.g.*, *State Nat'l Bank*, 795 F.3d at 53 ("There is no doubt that the Bank is regulated by the Bureau. Under *Lujan*, the Bank therefore has standing to challenge the constitutionality of the Bureau.").

Even if more specific injuries are needed, they are plainly present here. As we explained at length, the challenged rule prohibits ocean carriers from billing motor carriers for detention and demurrage even when delays are the motor carrier's sole fault, and therefore the ocean carrier cannot bill anyone else. Opening Br. 9, 15-17; *see also* 87 Fed. Reg. 62,341, 62,349 (Oct. 14, 2022) (acknowledging that this billing prohibition "is different from many of the billing systems currently employed"); pages 16-17, *infra* (discussing additional record evidence of this scenario). The Final Rule prohibits ocean carriers from collecting otherwise-collectable money; this economic

3

harm is plainly sufficient for standing. *See, e.g.*, *Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 5 (D.C. Cir. 2017) ("A dollar of economic harm is still an injury-in-fact for standing purposes.").

Perhaps more simply, there is ample evidence in the comment record that WSC's members will incur costs just to come into compliance with the rule's requirements. CMA CGM (America) Comment to NPRM) at 2 (JA__) (compliance with invoice requirements "will likely necessitate enhancements to our complex global information technology ('IT') system"); Mediterranean Shipping Company Comment to NPRM at 3 (JA__) ("[M]any of the proposed changes would … plac[e] greater administrative burdens on [] VOCCs."); Ocean Carrier Equipment Management Association, Inc. Comment to NPRM at 9-10 (JA__-__) (comment of association comprised of VOCCs (all of which are also WSC members), explaining the "additional burden associated with continued modification of carrier systems and forms" necessitated by the rule); *see also* Final Rule, 89 Fed. Reg. at 14,339 (acknowledging "that some regulated parties will need to change their business practices in order to comply with this rule").

Such compliance costs are undoubtedly cognizable Article III injuries. *See, e.g.*, *Ass'n of Am. Railroads v. Dep't of Transp.*, 38 F.3d 582, 586 (D.C. Cir. 1994) (finding standing "undeniab[e]" based on "the additional regulatory burden imposed" by new rules); *Hydro Res., Inc. v. EPA*, 608 F.3d 1131,

1144-1145 (10th Cir. 2010) (en banc) (Gorsuch, J.) ("[T]he out-of-pocket cost to a business of obeying a new rule of government … suffices to establish an injury in fact.").

Finally, there was no need for WSC to do more (*contra* FMC Br. 21) than reference and hyperlink a publicly available list of all its members. *See* WSC Comment to NPRM at 2 n.1 (JA__); Kramek Dec. ¶ 4 n.1. The purpose of the member-identification requirement is to allow "the court to assure itself" that the association in fact has members and that those members are in fact harmed, rather than relying on a "probabilistic" analysis. *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009). WSC has plainly done enough to satisfy that requirement here—the rule, which applies to all VOCCs, harms *all* of its members (Kramek Decl. ¶ 5), and WSC has disclosed the identity of all those members in a format that is readily ascertainable by the Court or anyone else.

Furthermore, WSC's membership and its purposes are set forth in a publicly available agreement filed with the FMC. *See* FMC, *World Shipping Council Agreement* (Agreement No. 201349), perma.cc/MW76-PVJ3 (last accessed Jan. 6, 2025). That agreement—which identifies WSC's members and is signed by them—explains that WSC is the "unified voice for the global

5

liner shipping industry on public policy matters impacting the industry." *Id*.[1]

**2.** All of the above is "self-evident" from "the administrative record," meaning that "no evidence outside the administrative record is necessary for the court to be sure" of WSC's standing. *Wynnewood Refining*, 77 F.4th at 767; *see also, e.g.*, *Window Covering Mfrs. Ass'n v. Cons. Prod. Safety Comm'n*, 82 F.4th 1273, 1282 (D.C. Cir. 2023) ("The WCMA has representational standing in this matter, as its members consist of companies who are the object of the action … at issue.").[2]

For avoidance of all doubt, however, WSC submits declarations from several of its members, explaining in even more detail the harms caused by the rule. *See, e.g.*, *Sierra Club v. U.S. Dep't of Energy*, 107 F.4th 1012, 1015 (D.C. Cir. 2024) (petitioner may "raise new standing evidence … in reply" if, when filing its opening brief, it "'reasonably assumed' that its standing was 'self-evident' from the administrative record.") (quoting *Twin Rivers*,

---

[1]  This case is thus a far cry from *Twin Rivers*, where the Court rejected the standing of a group whose "affidavit barely describes even the general contours of its membership." *Twin Rivers Paper Co. v. SEC*, 934 F.3d 607, 613 (D.C. Cir. 2019).

[2]  Though FMC does not explicitly challenge them, the germaneness and individual participation requirements for associational standing are also plainly met. *See Am. Fuel & Petrochemical Manufacturers v. EPA*, 3 F.4th 373, 380 (D.C. Cir. 2021) (trade association seeking vacatur of "a rule detrimental to the financial wellbeing of its members" satisfied both requirements).

934 F.3d at 614; *see also Am. Library Ass'n v. FCC*, 401 F.3d 489, 493-494 (D.C. Cir. 2005) (rejecting "a 'gotcha' trap whereby parties who reasonably think their standing is self-evident" are precluded from further "document[ing]" their standing on reply).

As described in those declarations, the rule has required WSC members to immediately alter their business practices for issuing demurrage and detention invoices, incurring costs to make the necessary process and systems upgrades. *E.g.*, O'Brien Decl. ¶¶ 10-12 (Maersk has incurred costs including "recoding IT systems, adjusting operational processes … [and] retrain[ing] employees"); Mansfeld Decl. ¶¶ 10-12; Goldman Decl. ¶¶ 9-12; Price Decl. ¶¶ 10-12; Magnani Decl. ¶¶ 10-12. The Final Rule has thus already imposed regulatory restrictions and costs on WSC members, in the form of increased compliance costs, not to mention the ongoing financial impact of being unable to charge for demurrage and detention in certain situations. *See* Magnani Decl. ¶¶ 8, 13; Mansfeld Decl. ¶¶ 8, 13; Price Decl. ¶¶ 10, 12. Certainly, nothing more is required for standing.

## II.    THE FINAL RULE IS CONTRARY TO STATUTE.

### A.    The Final Rule is incompatible with OSRA.

As we demonstrated, the Final Rule exceeds the FMC's authority under OSRA because it departs from the Incentive Principle that Congress codified into law. *See* Opening Br. 29-31. Indeed, the Final Rule departs

dramatically from that principle by prohibiting ocean carriers from billing motor carriers for demurrage or detention, even when doing so would incentivize cargo fluidity. *Id.* at 31-34. The Commission has therefore exceeded the limited rulemaking authority granted by Congress. *Id.*; Ocean Shipping Reform Act § 7(a), Pub. L. 117–146, 136 Stat. 1272, 1274 (2022) (prohibiting detention and demurrage invoices that do not "comply with … the principles of" the Interpretive Rule announcing the Incentive Principle); OSRA § 7(b)(2) (directing FMC to issue a rule that "shall only seek to clarify reasonable rules and practices" for detention and demurrage invoices "to address the issues identified" in the Interpretive Rule").

**1.** Surprisingly, given the Supreme Court's recent emphatic reaffirmation that "courts must exercise independent judgment in determining the meaning of statutory provisions" (*Loper Bright Enterprises. v. Raimondo*, 603 U.S. 369, 394 (2024)), the FMC begins with a plea for deference. FMC Br. 23-26 (suggesting, among other things, that "Congress delegated" authority to the agency to "fill up the details"); *see Loper Bright*, 603 U.S. at 394 (recognizing that sometimes, "the statute's meaning may well be that the agency is authorized to exercise a degree of discretion").

But as *Loper Bright* explains, even "[w]hen the best reading of a statute is that it delegates discretionary authority to an agency," the "reviewing

8

court" must still "independently interpret the statute" to "fix[] the boundaries of the delegated authority" and ensure that the agency's action remains within them. *Loper Bright*, 603 U.S. at 395. And here, the nature of WSC's principal argument is precisely about the scope of "the boundaries of the delegated authority"—*i.e.*, whether and to what extent that authority is constrained by the Incentive Principle Congress codified. The Court must answer that interpretive question "independently," without resort to deference. *Id.*

Nor should the Court give any weight to the agency's views under *Skidmore*. Most obviously, the FMC's understanding has not "remained consistent over time" (*Loper Bright*, 603 U.S. at 394) (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944))—to the contrary, when issuing the Final Rule, the FMC appeared to think that it did not impose the problematic prohibition that WSC is principally challenging here. *See* Opening Br. 19-21. And FMC's position notably lacks "the power to persuade" (603 U.S. at 402), not least because of the extensive failures of reasoned decisionmaking we have identified. *See* Opening Br. 38-49.

In the end, the FMC has attempted something that even the now-defunct *Chevron* regime would not have permitted: an "interpretive gerrymander[] under which an agency keeps parts of statutory context it likes while throwing away parts it does not." *Michigan v. EPA*, 576 U.S. 743, 754 (2015);

*see Whitman v. Am. Trucking Associations*, 531 U.S. 457, 485 (2001) (agency "may not construe the statute in a way that completely nullifies textually applicable provisions meant to limit its discretion."). Certainly, no deference is warranted.

**2.** As to substance, the FMC relies almost entirely on the fact that Congress instructed it to "determin[e] … which parties may be appropriately billed" for detention and demurrage. OSRA § 7(b)(2), 136 Stat. 1275-1276; *see* FMC Br. 26-29. But as we have already explained (at 7-8), that instruction does not stand alone: Congress also directed that the FMC's regulatory "determination" of properly billed parties should only "clarify" what practices are reasonable in light of the Interpretive Rule announcing the Incentive Principle. OSRA § 7(b)(2), 136 Stat. at 1275. Congress simultaneously mandated that detention and demurrage invoices must "comply with" the "principles of" the Interpretive Rule, *i.e.* the Incentive Principle. OSRA § 7(a), 136 Stat. at 1274 (codified at 46 U.S.C. § 41104(a)(15)(B)).

As we explained, these statutory provisions must "be read" as a "harmonious whole." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000). The only way to do that is to understand Congress's direction to "determin[e] … which parties may be *appropriately* billed" (OSRA § 7(b)(2), 136 Stat. 1275-1276 (emphasis added)) as asking for a determination of which parties may be billed *consistent with the Incentive Principle*. Opening

10

Br. 31-32. The FMC's position instead attempts to "rewrite clear statutory terms to suit [the agency's] own sense of how the statute should operate" (*Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014)); it must therefore be rejected.

The FMC next suggests that, if the text does not authorize its flat prohibition on billing motor carriers, then "the history of abuses in demurrage and detention" billing does. FMC Br. 28 (citing pages 6-7 of Fact Finding 29). Not only is this a dubious method of statutory interpretation, but the argument misconstrues the FMC's own factfinding record. Fact Finding 29 recommended that the Commission issue a rulemaking addressing "the *timing* of demurrage and detention billings" and the inclusion of "certain *minimum information*" with those invoices. Fact Finding No. 29, Interim Recommendations (July 28, 2021) at 6 (JA__). Neither of these recommendations had anything to do with which types of parties could be billed. And neither the interim recommendations nor the final report recommended that the Commission limit who can be billed for demurrage and detention to only the shipper or consignee.

Finally, to the extent the FMC is suggesting that its prohibition on billing motor carriers actually comports with the Interpretive Rule—notwithstanding its violation of the Incentive Principle—because the Interpre-

11

tive Rule technically allows for consideration of other factors beyond incentivization, that suggestion is baseless. *Cf.* FMC Br. 26-29 (relying on general conceptions of reasonableness). The Interpretive Rule is explicit that "*the chief consideration*" in "assessing the reasonableness of demurrage and detention" practices is "the extent to which [they] serve their purposes as financial incentives to promote freight fluidity"—*i.e.*, the Incentive Principle. 85 Fed. Reg. 29,638, 29,640 (May 18, 2020) (emphasis added); *see also* Opening Br. 28 (collecting additional quotations); 46 C.F.R. § 545.5 (codified Interpretive Rule, providing that the FMC "will consider" the Incentive Principle in assessing reasonableness, and that it "may consider" other factors).

A rule that flies in the face of the Incentive Principle simply cannot be squared with the Interpretive Rule, whose "principles" Congress codified into law. 46 U.S.C. § 41104(a)(15)(B); *see* OSRA § 7(b)(2), 136 Stat. 1275-1276. Because the Final Rule therefore exceeds the grant of authority in OSRA, the FMC's action is unlawful. *Mozilla Corp. v. FCC*, 940 F.3d 1, 86 (D.C. Cir. 2019); *see also Loper Bright*, 603 U.S. at 401 ("[A]bdication in favor of the agency is *least* appropriate" when the question concerns "the scope of an agency's own power").

**B.    The Final Rule exceeds the Commission's authority under 46 U.S.C. § 41102(c).**

We further explained that the Final Rule exceeds another statutory guardrail as well. *See* Opening Br. 34-38. Specifically, the rulemaking authorized by OSRA must "further defin[e] prohibited practices by [various industry actors] under section 41102(c)" (OSRA § 7(b)(1), 136 Stat. 1275), but the only practices prohibited by Section 41102 are those that are not "just and reasonable" (46 U.S.C. § 41102(c)). It follows inexorably that the FMC's rulemaking can only "define" a practice as "prohibited" by Section 41102(c) (OSRA § 7(b)(1)) if the practice to be prohibited meets that section's baseline requirement of being *un*just and *un*reasonable. *See* Opening Br. 34-38 (explaining that "just and reasonable" is a legal term of art in the context of an agency's regulation of private-entity conduct). But the FMC has made *no* determination that VOCCs act unjustly and unreasonably by billing motor carriers for detention and demurrage, particularly where there is a preexisting contractual relationship between the two parties.

The FMC offers little of substance in response. It first complains that there is "no support for imposing such a burden on a regulatory agency like FMC that is tasked with creating rules … under a broad 'just and reasonable' standard." FMC Br. 29. But that's just it—Section 41102(c) does not authorize *agency regulations* that happen to be "just and reasonable"; it pro-

13

hibits *private party conduct* if and only if that conduct is *not* "just and reasonable." 46 U.S.C. § 41102(c). It is therefore the statute itself that precludes the FMC from banning a practice without first determining that the practice is unjust and unreasonable.

The Commission also gestures at an argument that it actually has satisfied this factfinding burden. *Cf.* FMC Br. 29. As WSC explained, however, the FMC has *never* made a finding—not in Fact Finding 28, Fact Finding 29, the NPRM, or the Final Rule—that billing a motor carrier is *per se* unreasonable. *See* Opening Br. 36 (citing Commission description of some current billing practices as "untenable" but not "unreasonable"). Each of the Commission's fact-findings concerned transparency in billing information, the timing of billing requirements, and concerns about multiple parties receiving invoices for the same charges—concerns that apply equally to motor carriers, shippers, and consignees.[3] None of these factual findings revealed a problem unique to billing motor carriers as a class that would support a *per se* rule that billing motor carriers is unjust and unreasonable.

---

[3]  *See, e.g.,* Fact Finding 28 (Final Report) at 32 (JA__) (significant benefit would result from "[t]ransparent, standardized language for demurrage and detention practices"); 87 Fed. Reg. 8,506, 8,506 (Feb. 15, 2022) (ANPRM) (seeking comment on whether the Commission should require "certain minimum information on or with demurrage and detention billings" and require "certain practices regarding the timing" of such billings); 89 Fed. Reg. at 14,330 (recommending regulating the information contained in demurrage and detention billings and the timing of demurrage and detention invoices).

The FMC's only other argument is to suggest that a *per se* rule is reasonable under the circumstances. *See* FMC Br. 30. But again, that is non-responsive. As we explained, ample precedent establishes that, because "[s]tatutory reasonableness is … represented by an area rather than a pinpoint" (*Montana-Dakota Utilities Co. v. Nw. Pub. Serv. Co.*, 341 U.S. 246, 251 (1951)), the fact that the agency's preferred choice may be reasonable does *not* prove the inverse—that every alternative is *un*reasonable. Opening Br. 34-36; *see also, e.g.*, *Atl. City Elec. Co. v. FERC*, 295 F.3d 1, 9 (D.C. Cir. 2002) (under similar statutory scheme, "FERC must first prove that the existing rates or practices are 'unjust[ or] unreasonable,'" and then, separately "show that its proposed changes are just and reasonable"). And Section 41102(c)—which is what OSRA empowers the FMC to "further defin[e]"—prohibits only private-party practices that are affirmatively *un*reasonable.

As a result, the abstract reasonableness of the FMC's preferred approach (accepting *arguendo* that it is reasonable) does not itself demonstrate the unreasonableness of the practice it bans: billing motor carriers under any circumstances. The Commission's action is therefore inconsistent with the statute on this basis too.

15

## III.  THE FMC'S FINAL RULE IS ARBITRARY AND CAPRICIOUS.

### A.  The Final Rule is substantively arbitrary and capricious.

As WSC explained, the Final Rule is substantively arbitrary and capricious because it results in fundamentally unreasonable outcomes. Opening Br. 39-41. Again, the FMC's authority to regulate demurrage and detention charges comes from 46 U.S.C. § 41102(c), which requires "just and reasonable" billing practices, and the core of the reasonableness inquiry is whether demurrage or detention charges "are serving their intended primary purposes as financial incentives to promote freight fluidity." 46 C.F.R. § 545.5(c). Because the Final Rule prohibits invoicing motor carriers for demurrage and detention when it would otherwise comport with the Incentive Principle and 46 C.F.R. § 545.5(c), it is fundamentally unreasonable, and thus arbitrary and capricious.

FMC dismisses WSC's concern about the need to bill motor carriers as a "hypothetical scenario." FMC Br. 34. But the scenario is not at all hypothetical—evidence in the FMC's own factfinding substantiates it. *See* Fact Finding No. 28, Final Report, at 18 (JA__) (noting that problems with containers being picked up on the "last free day… resulted from shippers using terminals as storage, *truckers overcommitting*, and poor communication between shippers and consignees and *shippers and truckers*") (emphasis added). And WSC cited examples of truckers being at fault for delays in its

16

comments. *See* WSC NRPM Comments at 10 (JA__); *cf., e.g.*, *NGL Transportation LLC v. W. Basin Container*, 2016 WL 11817426, at *5 (C.D. Cal. Sept. 14, 2016) (assessment of demurrage and per diem fees against trucking companies not unlawful); *Nat'l Trucking & Storage Co. v. Pennsylvania R. Co.*, 228 F.2d 23, 30 (D.C. Cir. 1955) (upholding demurrage and detention charge against trucking company).

Again, motor carriers play an important role in the supply chain, and "if the motor carrier cannot be financially incentivized to pick up or return equipment on time," inefficiency and supply chain disruptions will result. WSC NPRM Comments at 9 (JA__). Evidence of this problem was before the agency when it made its decision, and "an agency cannot ignore evidence that undercuts its judgment" or "minimize such evidence without adequate explanation." *Genuine Parts Co. v. EPA*, 890 F.3d 304, 346 (D.C. Cir. 2018). And, of course, if a scenario in which ocean carriers will have reason to bill truckers were only hypothetical, it is curious that the Commission is so determined to ban that practice.

The FMC next relies on the distinction between bright-line rules and general standards to justify its rule. FMC Br. 30, 33-34; *see also id.* at 26-27 (arguing that agencies generally have authority to issue bright-line rules). This misapprehends our primary contention. WSC did not argue that "as a bright-line rule," the Final Rule "cannot co-exist with the incentive

17

principle in the Interpretive Rule." FMC Br. 33. WSC argued that the Final Rule contradicts the Incentive Principle *in substance* because it results in situations where demurrage and detention charges are not being used, or cannot be used, for their primary purpose of incentivizing fluidity in the supply chain. Opening Br. 39-40. This is a substantive mis-match, not one that depends on the form of the rule.

The FMC's final justification is that the rule does not prohibit billed parties from voluntarily seeking reimbursement from motor carriers. FMC Br. 35-36; *see* 89 Fed. Reg. at 14,330. This does not solve the problem. For one, it demonstrates that the FMC recognizes that motor carriers *can* sometimes be responsible for delays and *should* pay demurrage and detention to optimize freight fluidity. FMC Br. 35 (recognizing a trucker could be at fault for a delay). That being so, there is no principled reason not to allow motor carriers to be billed in the first instance in those circumstances.

Second, this explanation again fails to account for carrier haulage contracts. In a carrier haulage contract (as WSC explained) the shipper or consignee does not have a direct contractual relationship with the motor carrier—the ocean carrier contracts directly with the motor carrier for the inland portion of the transportation. Opening Br. 15. It would therefore be challenging, if not impossible, for those consignees or shippers to seek reimbursement from a motor carrier with whom they do not have a contract. Not

only that, but if the trucker caused the delay that triggered the charge, billing the shipper or consignee in the first instance would be impermissible under 46 U.S.C. § 41104(a)(15). Thus, the Commission's proposed solution—for a shipper or consignee to pass the bill on to the trucker—is precluded by the statute and the Commission's own regulations. Again, the substantive result is unreasonable.

**B.    The Final Rule is procedurally arbitrary and capricious.**

The opening brief also demonstrated that the Final Rule is procedurally arbitrary and capricious in multiple respects. *See* Opening Br. 41-49.

**1.** As to our demonstration that the Final Rule lacks a reasoned explanation for banning the invoicing of motor carriers in all instances, the FMC's only response is to point this Court to three pages of the Final Rule, where it claims it explained its decision "in detail." FMC Br. 31-32 (citing 89 Fed. Reg. 14,338-14,341). But the FMC's chief argument, reflected in the cited pages as well as throughout its brief, is internally inconsistent and contradicts its ultimate conclusion.

FMC states, repeatedly, that it chose to limit demurrage and detention billing to shippers and consignees because "these parties would likely have greater knowledge of such contracts and a greater ability to evaluate and potentially dispute demurrage and detention charges." 89 Fed. Reg. at 14,338-14,341; FMC Br. 32, 38-39. This explanation does not support the

FMC's decision to carve out motor carriers entirely, however, because (as WSC explained), under a carrier haulage contract, motor carriers *are* the parties to the contract with the ocean carrier and *have* negotiated the demurrage and detention terms under which they are billed. According to the FMC's own logic, then, motor carriers "would be in the best position" to understand and contest those charges.

Indeed, FMC initially *agreed* with the logic of WSC's position, before correcting the text of the Final Rule preamble. The FMC wrote in the original Final Rule text that "a primary purpose of this rule is to stop demurrage and detention invoices from being sent to parties who did not negotiate contract terms with the billing party. ***That concern is not present where a motor carrier has directly contracted with a VOCC***." 89 Fed. Reg. at 14,336 (emphasis added). Here, the FMC recognizes that its chief concern— protecting non-contracting parties from receiving demurrage and detention invoices—is not present when a motor carrier has directly contracted with a VOCC (*i.e.*, a carrier haulage situation). But the FMC still excludes motor carriers from the definition of a "properly billed party" in all circumstances. Its decision therefore lacks "rational connection between the facts found and the choice made," rendering the action arbitrary and capricious. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

20

Moreover, the FMC's shifting explanation is itself problematic under the APA. In its brief, the FMC discounts the original text as one "obviously garbled paragraph." But it also relies on the very same paragraph to argue that the Commission considered WSC's comments and "expressly declined" to alter the Final Rule's language to include motor carriers (FMC Br. 16)— an explanation made all the more confusing by the Commission's later assertion that the Correction "re-affirmed the Final Rule's statement that truckers cannot be billed" (FMC Br. 17), even though the Final Rule originally said the exact opposite. *Cf.* 89 Fed. Reg. at 14,336 ("[N]othing in this rule … prohibits a VOCC from issuing a demurrage or detention invoice to a motor carrier when a contractual relationship exists between the VOCC and the motor carrier to provide carriage or storage of goods to the VOCC."). This "internally inconsistent" reasoning cannot survive arbitrary and capricious review. *ANR Storage Co. v. FERC*, 904 F.3d 1020, 1028 (D.C. Cir. 2018).

And the conflict between the language of the rule and preamble is not limited to one "garbled paragraph." FMC Br. 37. In addition to the paragraph that the Commission "corrected," there remains a lengthy discussion explaining that marine terminal operators (MTOs) *may* bill truckers for detention and demurrage through implied-in-law contracts established by MTO schedules. 89 Fed. Reg. at 14,339-14,340. But ocean carriers and

MTOs are both "billing parties" under the rule and are subject to the same treatment. 46 C.F.R. §§ 541.3 (definition of "billing party"); 541.4 (substantive prohibition, applying to any "billing party"). The fact that the preamble, even after "correction" by the FMC, remains flatly inconsistent with the Final Rule is further evidence that the Commission has not adequately explained its result. *See Wyo. Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43, 53 (D.C. Cir. 1999) ("[T]he preamble to a regulation is evidence of an agency's contemporaneous understanding of its proposed rules.").

**2.** We also explained that the FMC did not meaningfully respond to WSC's comment that the rule unlawfully departed from the Incentive Principle by prohibiting VOCCs from billing motor carriers even when those parties have contractual relationships. Opening Br. 43-45; *see, e.g.*, *TransCanada Power Mktg. Ltd. v. FERC*, 811 F.3d 1, 12 (D.C. Cir. 2015) (agency must "respond meaningfully to the arguments raised before it").

Tellingly, the FMC does not even attempt to rebut our demonstration that the Commission's answer to this critical comment was the exact type of "non sequitur" response that the APA does not allow. *City of Vernon v. FERC*, 845 F.2d 1042, 1048 (D.C. Cir. 1988); *see* FMC Br. 37-39. Instead, the FMC lists a host of *other* objections from commenters that it *did* respond to. *See id.* But obviously, an agency's obligation to "respond to significant points and consider all relevant factors raised by the public comments"

22

(*Carlson v. Postal Regul. Comm'n*, 938 F.3d 337, 344 (D.C. Cir. 2019)) is not satisfied by responding to only *some* important comments and leaving others unaddressed. *See, e.g.*, *Bloomberg L.P. v. SEC*, 45 F.4th 462, 476 (D.C. Cir. 2022) ("The agency need not address every comment, but it must respond in a reasoned manner to those that raise significant problems.").

Because WSC's comment "raise[d] significant problems" with the FMC's proposed rule (*id.*), it required a meaningful response. The lack of such a response is reason enough to set aside the Final Rule.

**3.** The Final Rule is also arbitrary and capricious given its unexplained departure from the Incentive Principle, which the Commission promulgated in the Interpretive Rule just four years ago. Opening Br. 46-49. The FMC agrees that, in order to depart from a prior rule, agencies must display awareness that they are doing so. FMC Br. 39 (quoting *Sinclair Wyoming Ref. Co. v. EPA*, 114 F.4th 693, 711 (D.C. Cir. 2024)). But the FMC does not point to *any* language in its rulemaking to support its assertion that it "display[ed] awareness" that it was departing from the Incentive Principle—because there is none. To the contrary, the Final Rule initially asserted that it did *not* prohibit billing motor carriers with which a VOCC has a contractual relationship—and when the Correction reversed that language, it did not substitute any reasoned analysis that could satisfy the

23

Commission's APA obligations. *See* Opening Br. 48-49. For this reason, too, the Final Rule is arbitrary and capricious.

## IV. WSC HAS STANDING TO CHALLENGE THE FMC'S FLAWED NEPA ORDER.

We also explained that the Commission's action violates NEPA. Opening Br. 49-55.

The FMC principally responds that WSC lacks NEPA standing because it failed to allege a specific harm from the Commission's NEPA violation or argue that the Commission's NEPA Order "violated the APA or any other non-NEPA statute." FMC Br. 41-42. But this misstates the law. As this Court has explained, "NEPA imposes *only procedural requirements*," so if parties needed to show that an agency's NEPA failure caused *more* than a procedural injury, "there will be nothing left to the protections that Congress intended the Act to provide." *Oglala Sioux Tribe v. U.S. Nuclear Regul. Comm'n*, 896 F.3d 520, 534 (D.C. Cir. 2018).

Therefore, while courts can excuse mere "technical errors" as harmless under NEPA, that does not extend to a "significant deficiency" in the agency's review. *Oglala Sioux Tribe*, 896 F.3d at 534. Where, as here, the Commission failed to take a "hard look" at the environmental impact of its rule because it fundamentally misapprehended the rule's effects, that error is not harmless. *Id*.; *see also WildEarth Guardians v. Jewell*, 738 F.3d 298, 308 (D.C. Cir. 2013) (standing adequately alleged where organization's

24

"members' injuries are caused by the allegedly unlawful [agency decision] and would be redressed by vacatur of the [decision] on the basis of any of the procedural defects identified in the FEIS").

Moreover, the redressability prong of the standing test is "relaxed … in cases involving procedural injuries. A plaintiff need only show that the agency revisiting its action *could* lead to a different conclusion." *Ctr. for Biological Diversity v. EPA*, 861 F.3d 174, 185 (D.C. Cir. 2017); *WildEarth*, 738 F.3d at 306. WSC has certainly made that showing, given that under its view, the Commission misapprehended the significant environmental effects that its action would have—effects that it would need to consider if it were to revisit its NEPA analysis.

Finally, WSC has prudential standing under NEPA. "To be adversely affected within NEPA, appellants must at least demonstrate that they can satisfy all constitutional standing requirements" (which WSC has, see pages 2-7, *supra*), "and that their particularized injury is to interests of the sort protected by NEPA." *Fla. Audubon Soc. v. Bentsen*, 94 F.3d 658, 665 (D.C. Cir. 1996).

WSC has significant and particular interest in the liner shipping industry's ability to achieve near-zero carbon emissions by 2025, and participated extensively in the MEPC 82nd Session in consultative status. Kramek

25

Decl. ¶ 14. In the proceedings below, WSC explained the detrimental environmental effects of the Final Rule, which will set back WSC's environmental goals. *Id.* ¶¶ 14-15. This suffices for NEPA standing. *Competitive Enter. Inst. v. NHTSA*, 901 F.2d 107, 123 (D.C. Cir. 1990); *see Gunpowder Riverkeeper v. FERC*, 807 F.3d 267, 274 (D.C. Cir. 2015) ("A party is not precluded from asserting cognizable injury to environmental values because his 'real' or 'obvious' interest may be viewed as monetary.").

The Commission's only response on the NEPA merits is that it did not underestimate the environmental impacts because it determined the Final Rule is "consistent with the incentive principle." FMC Br. 44. This argument merges with the arguments above. If WSC is correct that the Final Rule departs from the Incentive Principle, there is good reason to think that increased port congestion would result. *See* Opening Br. 52-54 (noting increased emissions due to port congestion and WSC's presentation of those issues to the FMC below). The FMC admits that it did not consider these impacts because it did not believe the Final Rule would contribute to port congestion. FMC Br. 44. But because those effects were reasonably foreseeable, the FMC violated NEPA by failing to consider them. *WildEarth Guardians v. Zinke*, 368 F. Supp. 3d 41, 68-71 (D.D.C. 2019).

## V.  THE COURT SHOULD ORDER COMPLETION OF THE ADMINISTRATIVE RECORD.

This Court should order completion of the administrative record with the correspondence between the FMC and WSC, along with any other inquiries that prompted the FMC's decision to amend the preamble. FMC's arguments against completing the record lack merit.

First, and notably, the FMC does not dispute that the inquiries it received prompted the clarifying correction to the Final Rule. FMC Br. 45. The FMC also does not appear to object to this Court considering the emails (at least, those emails between WSC and the FMC). FMC Br. 46 (saying WSC has placed them "before the Court"). Yet, the FMC maintains that these communications are not properly part of the record—a puzzling position given that this Court's review of agency action "can be based only on the administrative record." *Consumer Fed'n of Am. & Pub. Citizen v. U.S. Dep't of Health & Hum. Servs.*, 83 F.3d 1497, 1506 (D.C. Cir. 1996).

Second, FMC recites the wrong standard for completing the record. FMC Br. 45 (quoting *Safe Skies Clean Water Wisconsin, Inc. v. United States Air Force*, 2022 WL 22626434, at *1 (D.D.C. Sept. 30, 2022)). *Safe Skies* involved a request to *supplement* the record, not one to *complete* the record. As we have explained, a motion to complete the record with evidence improperly omitted from it is subject to a much less stringent standard than a

27

motion to supplement the record with materials that were *not* initially before the agency. Opening Br. 55-56 (citing *Oceana, Inc. v. Ross*, 290 F. Supp. 3d 73, 78 (D.D.C. 2018); *Open Soc'y Inst. v. USCIS*, 573 F. Supp. 3d 294, 307 (D.D.C. 2021)).

The FMC's response to this point—that the email inquiries "were not 'before' the Commissioners" (FMC Br. 45)—is bizarre. The FMC states that "the email inquiries were never made available to the Commissioners, quoted to them, or described to them in any detail." *Id.* at 47. But the Commission changed the preamble language in a Federal Register notice signed "[b]y the Commission," which acknowledged it was spurred by "inquiries" that were received and "appreciate[d]" by *the Commission*. 89 Fed. Reg. 39,569, 39,569-39,570 (May 9, 2024). The FMC's post-hoc suggestion that the Commissioners never received or considered these communications is thus contradicted by the Correction itself. Moreover, if the Commissioners did not review the inquiries, then *whoever did review them* is clearly "the ultimate agency decision-maker" responsible for the Correction (FMC Br. 47), meaning the communications are properly part of the record in any event.

Finally, the FMC attempts to justify its failure to include the communications in the record because doing so "could undermine … open government" and chill future communications with agency staff. FMC Br. 46-47.

The FMC cites no authority for the notion that an agency can exclude materials from the record on this basis. And it makes little sense, as communications with agency staff are subject to public release under the Freedom of Information Act. *See Vanda Pharms., Inc. v. Food & Drug Admin.*, 2023 WL 2645714, at *4 (D.D.C. Mar. 27, 2023) ("Disclosure cannot chill deliberations if those deliberating do not reasonably expect their deliberations to remain private" to begin with). There is, accordingly, no basis to exclude these communications from the record. They were actually "before the agency at the time of its decision," and are thus properly part of the administrative record. *Open Soc'y*, 573 F. Supp. 3d at 307.

## CONCLUSION

The Court should grant WSC's motion to complete the record and vacate the Final Rule to the extent it prohibits billing motor carriers for demurrage and detention.

29

Dated: January 13, 2025          Respectfully submitted,

                                 /s/ Paul W. Hughes
                                 PAUL W. HUGHES
                                 ANDREW A. LYONS-BERG
                                 GRACE WALLACK
                                   McDermott Will & Emery LLP
                                   500 North Capitol Street NW
                                   Washington, DC 20001
                                   (202) 756-8000

                                 Counsel for Petitioner
                                 World Shipping Council

**CERTIFICATE OF COMPLIANCE**

Pursuant to Federal Rule of Appellate Procedure 32(g), I hereby certify that this brief:

(i)    complies with the type-volume limitation of Rule 32(a)(7) because it contains 6,498 words, excluding the parts of the brief exempted by Rule 32(f) and Circuit Rule 32(e)(1); and

(ii)    complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared using Microsoft Office Word 2016 and is set in New Century Schoolbook LT Std font in a size equivalent to 14 points or larger.

Dated: January 13, 2025                    */s/ Paul W. Hughes*

**CERTIFICATE OF SERVICE**

I hereby certify that on January 13, 2025, I electronically filed the foregoing brief with the Clerk of this Court using the CM/ECF system, and counsel for all parties will be served by the CM/ECF system.

Dated: January 13, 2025                    */s/ Paul W. Hughes*